| | | |
|---|---|---|
| CORPORAL DARRIN OTT, | : | CIVIL NO: 4:14-CV-00785 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | (Chief Magistrate Judge Schwab) |
| | : | |
| SERGEANT LARRY E. | : | |
| GOODWIN, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM[1]

### I. Introduction.

In this case, we are compelled to determine whether recording a state trooper's personal telephone conversations with his wife violated federal wiretapping laws, when that trooper engaged in those personal conversations while he was on duty and using a telephone line at his state police barracks, which automatically recorded the calls coming through that line. For the reasons set forth below, we find that there was no such violation and, thus, we will enter summary judgment in favor of the defendants on the plaintiff's federal wiretap act claim. In

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case and to order the entry of a final judgment in accordance with 28 U.S.C. § 636(c). *See doc. 10.* Pursuant to that authority, the Undersigned Chief Magistrate Judge issues this Memorandum, addressing the defendants' currently pending motion for summary judgment. *See doc. 49.*

addition, we will decline to exercise supplemental jurisdiction over the plaintiff's remaining state-law claims, and we will, therefore, dismiss those claims from this action, but without prejudice to the plaintiff seeking relief in state court.

## II. Background.

The plaintiff, Corporal Darrin Ott ("Corporal Ott"), alleges that while he was employed by the Pennsylvania State Police and stationed at the barracks in Coudersport, Pennsylvania, the defendants accessed, listened to, and replayed recorded telephone conversations that he had with his wife, while he was on duty and using a telephone line located at the barrack's communications desk. Corporal Ott, who asserts that he did not know this telephone line was being recorded, further alleges that the defendants then re-recorded and replayed these telephone conversations.

The defendants contend, however, that they were reviewing the recordings at the communications desk in an attempt to identify the sender of an anonymous letter, which was harassing in nature and sent to one of the defendants. Corporal Ott acknowledges that during his telephone conversations, he and his wife discussed, among other things, the need to obtain an envelope. And so, Corporal Ott believes that this discussion ultimately served as the basis of an allegation that he and his wife were the ones involved in sending the anonymous, harassing letter. But, as Corporal Ott contends, this allegation not only proved to be unfounded, but

it also created a hostile work environment for him as it eroded the trust and respect of those with whom he worked at the Coudersport Barracks, as well as those stationed at the other surrounding barracks.

As a result, Corporal Ott instituted this action pursuant to 42 U.S.C. § 1983 by filing a counseled complaint on April 23, 2014. *Doc. 1*. In his complaint, Corporal Ott raises the following five counts: Count I, a violation of Pennsylvania's wiretap law; Count II, a violation of the federal wiretap law; Count III, a First Amendment retaliation claim; Count IV, a Fourteenth Amendment procedural due process claim; and finally, Count V, an intentional infliction of emotional distress claim. *Id.* at 12-17. In addition, Corporal Ott names the following four defendants, all of whom were also employed by the Pennsylvania State Police and stationed at the barracks in Coudersport, Pennsylvania during the relevant time period: (1) Larry E. Goodwin, a Sergeant ("Sergeant Goodwin"); (2) Chad E. Savannah, a trooper ("Trooper Savannah"); (3) Neal R. Fausey, another trooper ("Trooper Fausey"); and (4) Rhonda K. Stimaker, a clerk typist ("Clerk Stimaker").[2] *Id.* at 2. As for relief, Corporal Ott seeks nominal, compensatory, and punitive damages, as well as statutory attorney fees and costs. *See id.* at 13-17.

---

[2] Collectively referred to hereinafter as the "Defendants."

In response to the complaint, the Defendants filed an answer (*doc. 6*), followed by a motion for partial judgment on the pleadings (*doc. 14*). On February 24, 2016, we granted in part and denied in part that motion. *See doc. 35*. More specifically, we granted the motion, but only with respect to the First and Fourteenth Amendment claims, and thus dismissed Counts III and IV from the complaint. *See id.* Following our ruling, the parties engaged in extensive discovery, seeking several extensions of time in order to do so. *See docs. 32*, *34*, *37*.

Now, on the heels of that discovery, the Defendants have filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil procedure. *See doc. 49.* They request that summary judgment be entered in their favor on the surviving claims in the complaint—Count I, a violation of Pennsylvania's wiretap law; Count II, a violation of the federal wiretap law; and Count V, an intentional infliction of emotional distress claim. *See id.* In concert with their motion, they have also filed a statement of the material facts, a supporting brief, and various exhibits. *See docs. 50*, *51*, *52*.

In response, Corporal Ott has filed an amended statement of the material facts and an amended brief in opposition. *See docs. 65*, *66*; *see also doc. 63* (containing our Order, identifying various deficiencies in Corporal Ott's original filings and directing him to comply with the Local Rules of this Court by

amending those filings).[3]  And the Defendants have since filed a reply brief.  *See doc. 69.*

Thus, the Defendants' motion for summary judgment, which has been fully briefed, is ripe for our disposition.  For the reasons that follow, their motion will be granted.

### III. Statement of Material Facts.

Pursuant to the Local Rules for the U.S. District Court for the Middle District of Pennsylvania, a party moving for summary judgment must attach to the motion "a  separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  M.D. Pa. L.R. 56.1. The non-moving party is required to submit "a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in [the moving party's statement], as to which it is contended that there exists a genuine issue to be tried."  *Id.*  Both statements must

---

[3] In that Order, we also directed Corporal Ott as follows:

> If the [Corporal Ott] still implores the Court to consider his separate, counter-statement of the material facts, then [he] shall also file, on or before October 2, 2017, a supplemental brief on the Court's docket, explaining a legally and factually sufficient basis for doing so.

*Doc. 63* at 6.  Because, however, that deadline has passed, and considering that Corporal Ott has not filed any such brief, we deem him to have forfeited his right to do so. We will not, therefore, consider his counter-statement of the material facts (*doc. 61*) in deciding the instant motion for summary judgment.

reference the record for support, and the moving party's statement will be deemed admitted unless controverted by the non-moving party. *See id.*

As we explained above, the Defendants, as the party moving for summary judgment, have submitted a statement of the material facts, supported by adequate references to the record. *See doc. 50.* In response, Corporal Ott has submitted an amended, responsive statement of the material facts. *Doc. 66.*[4] Thus, we set forth below the undisputed material facts, as culled from the parties' statements.

**A. The Parties.**

Corporal Ott has been a member of the Pennsylvania State Police (hereinafter, "PSP") since 1993. *Doc. 50* at ¶ 1; *doc. 66* at 3. In 2012, the year that is relevant to the allegations in the complaint, Corporal Ott was a patrol unit supervisor at the PSP barracks in Coudersport, which is in Troop F.[5] *Doc. 50* at ¶ 2; *doc. 66* at 3.[6]

Sergeant Goodwin was the station commander at the Coudersport Barracks until his retirement on January 1, 2016. *Doc. 50* at ¶ 3; *doc. 66* at 3. As the

---

[4] Even though this Court graciously provided Corporal Ott's counsel with an opportunity to amend his responsive statement of the material facts, he has still responded, at times, with assertions that are unsupported by citations to the record. Such unsupported assertions will not be considered.

[5] We will simply refer hereinafter to these barracks as the "Coudersport Barracks."

[6] Following the alleged incidents in the complaint, Corporal Ott asked to be, and ultimately was, transferred to another PSP barracks. *See doc. 65-2* at 28-29 (dep. 28:25-29:23) (containing Corporal Ott's deposition testimony).

station commander, Sergeant Goodwin was responsible for oversight of all personnel at the Coudersport Barracks, including Trooper Savannah, Trooper Fausey, and Clerk Stimaker.  *See doc. 50* at ¶ 4; *doc. 66* at 3.

As for the Troopers, Trooper Savannah was stationed at the Coudersport Barracks from September of 2009 until March of 2013 (*doc. 50* at ¶ 5; *doc. 66* at 3), and Trooper Fausey was stationed at the Coudersport Barracks from November of 2010 until July of 2015 (*doc. 50* at ¶ 6; *doc. 66* at 3).

Finally, Clerk Stimaker has worked as "the clerk" at the Coudersport Barracks since November of 2006.  *Doc. 50* at ¶ 7; *doc. 66* at 3.

**B. Background on the Recorded Telephone Lines.**

The Coudersport Barracks maintains a communications desk for the purpose of, among other things, fielding calls from the public.  *Doc. 50* at ¶ 25; *doc. 66* at ¶ 25. There are two handheld telephones at the communications desk, and calls coming through those telephones are automatically recorded.  *See doc. 50* at ¶ 26; *doc. 66* at ¶ 26.  When using the telephone lines at the communications desk, there are beeps on the line, which indicate that the call is being recorded.  *Doc. 50* at ¶ 27; *doc. 66* at ¶ 27.

The recordings from these telephones are saved on an Eventide Machine, which is also located at the communications desk.  *Doc. 50* at ¶ 28; *doc. 66* at ¶ 28. The log-in information, to access the recordings on the Eventide, was displayed on

the outside of that machine. *Doc. 50* at ¶ 29; *doc. 66* at ¶ 29. PSP personnel have had occasion in the past to review recordings saved on the Eventide Machine in order to confirm information conveyed by a caller, to finish writing reports, and to play back a call simply because it is funny. *Doc. 50* at ¶ 30; *doc. 66* at ¶ 30.

**C. Corporal Ott's Telephone Calls With His Wife.**

On March 16, 2012, while performing desk and communication duties at the Coudersport Barracks, Corporal Ott used the telephones at the communications desk to engage in multiple conversations with his wife, Karen Ott ("Mrs. Ott"). *Doc. 50* at ¶ 31; *doc. 66* at ¶ 31. During those conversations, Corporal Ott and Mrs. Ott discussed, among other things, the need for a large envelope. *Doc. 50* at ¶ 32; *doc. 66* at ¶ 32. They also discussed that it was important for this envelope to be mailed before the Coudersport Post Office closed the following day, Saturday, March 17, 2012. *Doc. 50* at ¶ 32; *doc. 66* at ¶ 32. These telephone conversations were automatically recorded (*doc. 50* at ¶ 33; *doc. 66* at ¶ 33), and they were saved on the Coudersport Barrack's Eventide Machine (*doc. 50* at ¶ 34; *doc. 66* at ¶ 34).

**D. The Anonymous Letter.**

Thereafter, on March 29, 2012, Clerk Stimaker received an anonymous letter at her home, which suggested that the sender knew what was going on with her and "Andy." *See doc. 50* at ¶¶ 8, 9; *doc. 66* at ¶ 9. The letter also made reference to the "barracks" and asked what "the Sarge," presumably Sergeant Goodwin, would

think about their actions.  *See doc. 50* at ¶ 9; *doc. 66* at ¶ 9.  During her deposition, Clerk Stimaker testified that she received this letter after several hang-up calls and blocked calls had been made to her home and cell phone, as well as to her husband's workplace.  *Doc. 50* at ¶ 10 (citing *doc. 51-7* at 14-15 (dep. 13:23-14:4)).  And, in the PSP Incident Report, Clerk Stimaker reported that these calls continued even after receiving the anonymous letter.  *See doc. 66* at ¶ 10 (citing *doc. 66-3* at 3).

During his deposition, Corporal Ott testified that other members of the Coudersport Barracks had also been receiving hang-up phone calls.  *Doc. 50* at ¶ 11 (citing *doc. 51-3* at 31-32 (dep. 30:24-31:5)).  Corporal Ott further testified that Andy Mincer ("Mincer"), another PSP trooper, had told him that his (Mincer's) ex-girlfriend may have been the one responsible for making these calls, stating that his ex-girlfriend was "fucking with the guys."  *Doc. 66* at ¶ 11 (quoting *doc. 66-4* at 36 (dep. 36:17)).  Based on the record before us, both parties seem to acknowledge that Mincer is probably the "Andy" that was referenced in the anonymous letter to Clerk Stimaker.

### E. The Report to Sergeant Goodwin.

On the following day, March 30, 2012, Clerk Stimaker had a day off, but went into the Coudersport Barracks to discuss the anonymous letter with Sergeant

Goodwin.[7] *See doc. 50* at ¶ 12; *doc. 60* at ¶ 12. Sergeant Goodwin was working in his office when Clerk Stimaker first showed him the letter. *See doc. 50* at ¶ 13; *doc. 66* at ¶ 13. In regards to the contents of the letter, Sergeant Goodwin testified at his deposition that he had concern for the safety of his employee. *Doc. 50* at ¶ 14; *doc. 66* at ¶ 14.[8]

### F. Assistance from Trooper Savannah and Trooper Fausey in Accessing the Recorded Telephone Conversations.

On that same day, March 30, 2012, Trooper Fausey was working the communications desk. *Doc. 50* at ¶ 17; *doc. 66* at ¶ 17. Trooper Savannah was also on duty that day. *Doc. 50* at ¶ 18; *doc. 66* at ¶ 18. Clerk Stimaker showed Trooper Fausey and Trooper Savannah the anonymous letter, explaining that she believed it had been sent to her by another trooper's ex-girlfriend—presumably, Mincer's ex-girlfriend. *Doc. 50* at ¶ 19; *doc. 66* at ¶ 19.[9]

---

[7] Corporal Ott does clarify, however, that Clerk Stimaker had actually called Sergeant Goodwin about the anonymous letter and the contents contained therein, before she went into the Coudersport Barracks on March 30, 2012. *Doc. 66* at ¶ 12 (citing *doc. 66-5* at 10-11 (dep. 10:22-11:23)).

[8] While Corporal Ott does not meaningfully dispute these facts, he questions the credibility of Sergeant Goodwin's testimony and whether Sergeant Goodwin had, in fact, been concerned with Clerk Stimaker's safety at any point prior to his deposition. *Doc. 66* at ¶ 14.

[9] Although Corporal Ott alleges that Clerk Stimaker stated, on previous occasions, that she suspected someone from the barracks was involved, the citation to which he points does not support this allegation. *See doc. 66* at ¶ 19.

In connection with these facts, the Defendants proffer that Trooper Savannah and Trooper Fausey already knew that Clerk Stimaker had also been receiving hang-up calls. *Doc. 50* at ¶ 20. Although it appears that Trooper Fausey had already known about these hang-up calls (*doc. 51-6* at 17 (dep. 16:16-25)), it does not appear that Trooper Savannah also knew, prior to March 30, 2012, that Clerk Stimaker had been receiving such calls (*doc. 66* at ¶ 20 (citing *doc. 51-5* at 15-16 (dep. 14:25-15:16)).

Regardless, Clerk Stimaker enlisted the assistance of Trooper Fausey to access the Eventide Machine in order to determine whether Mincer's ex-girlfriend had called asking for her address on March 16, 2012. *Doc. 50* at ¶ 21; *doc. 66* at ¶ 21. Clerk Stimaker believed that March 16, 2012, was the date to focus on because of the information that she had received from Mincer. *Doc. 50* at ¶ 22; *doc. 66* at ¶ 22; *see also doc*. 51-7 at 20 (dep. 19:1-10) (containing Clerk Stimaker's deposition transcript, where she testifies that Trooper Mincer had called her on March 16th, explaining that his girlfriend or ex-girlfriend had called him and stated that she was going to call Mincer and Clerk Stimaker's sergeants and let those sergeants know about Mincer and Clerk Stimaker's relationship).

Trooper Fausey, however, did not know how to playback the recordings, and so, he asked Trooper Savannah to do it. *Doc. 50* at ¶ 23; *doc. 66* at ¶ 23. Trooper

Savannah, using the posted instructions, was able to playback the recordings from the Eventide Machine. *Doc. 50* at ¶ 35; *doc. 66* at ¶ 35.

### G. Listening to the Recordings.

Trooper Savannah, with Trooper Fausey and Clerk Stimaker present, began reviewing the recordings that were saved on the Eventide Machine, focusing on calls from March 16, 2012. *Doc. 50* at ¶ 36; *doc. 66* at ¶ 36. Troopers Savannah and Fausey were looking for any indication that Clerk Stimaker's personal address had been given out by an employee who had been working the front desk. *Doc. 50* at ¶ 37; *doc. 66* at ¶ 37. And, in reviewing the recordings, Trooper Savannah, Trooper Fausey, and Clerk Stimaker came across, and listened to, the telephone conversations between Corporal Ott and his wife (*doc. 50* at ¶ 40; *doc. 66* at ¶ 40), wherein they discuss the need to obtain a large envelope.

Although Corporal Ott does not dispute the actual content of these conversations he had with his wife, he does dispute the nature of that content. More specifically, he contends that the content was "personal in nature," and "not administrative" or "evidence of a crime." *Doc. 66* at ¶ 32. In a similar vein, although Corporal Ott does not dispute that these conversations were automatically recorded, he does dispute whether he was aware of this fact on March 16, 2012, the date on which he and his wife engaged in these conversations. *Id.* at ¶ 33 (citing his deposition testimony at *doc. 66-10* at 100-01 (dep 100:22-101:17, wherein he

testified that he did not know "line three," the line he has been telling his wife for years was unrecorded, was actually being recorded); *see also doc. 66-11* at 19 (dep. 19:18-22) (containing Mrs. Ott's deposition testimony, wherein she states that she would always call "line three").

In addition, the parties disagree about the motivation behind Trooper Savannah and Trooper Fausey's decision to access the recordings. *Compare doc. 50* at ¶ 38 (claiming that the troopers believed they might encounter information relating to what could ultimately be reported as criminal activity) *with doc. 66* at ¶ 38 (opposing this claim, stating that Trooper Fausey was not concerned with Clerk Stimaker's safety, and that she herself was only concerned for her reputation and marriage). Nevertheless, the Defendants have pointed to Trooper Savannah's deposition testimony, where he states that he felt that accessing the recordings "was part of [his] job. It was an obligation for [him] to do as [Clerk Stimaker] requested to obtain that information she believed relevant to her receiving these calls and this letter so that she could pass it on to the station commander." *Doc. 50* at ¶ 39 (citing *doc. 51-5* at 48-49 (dep. 47:25-48:5)). Corporal Ott, on the other hand, points to Trooper Savannah's Internal Affairs Interview, where he states that he was just trying to help out Clerk Stimaker. *Doc. 66* at ¶ 39 (citing *doc. 66-13* at 14 (dep. 14:13-18)).

**H. Sergeant Goodwin's Response.**

At his deposition, Sergeant Goodwin testified that, although he did not initiate an official investigation regarding these events, he considered whether there were any criminal violations committed and ultimately enlisted the assistance of the crime supervisor, Corporal Murray, to obtain a copy of the recording. *Doc. 50* at ¶ 15; *doc. 66* at ¶ 15. In addition, Sergeant Goodwin reviewed (at some point) the recordings at the communications desk with the assistance of Corporal Murray to decipher whether there was any concern over an issue of hostile work environment. *Doc. 50* at ¶ 16; *doc. 66* at ¶ 16. Although Corporal Ott does not meaningfully dispute these facts, he contends that Sergeant Goodwin's failure to initiate an official investigation ultimately earned Sergeant Goodwin a Disciplinary Action Report for failing to perform his duties. *See doc. 66* at ¶ 15 (citing *doc. 66-6*).

**I. Corporal Ott's Personal Knowledge About These Events.**

Corporal Ott has no personal knowledge of how many times Trooper Savanah, Trooper Fausey, or Sergeant Goodwin played the recordings. *Doc. 50* at ¶ 41; *doc. 66* at ¶ 41. Indeed, in referring to the Defendants, Corporal Ott testified as follows at his deposition: "I don't know how many times any of the people in this room played it, who directed it or who was responsible because I was not there." *Doc. 50* at ¶ 42; *doc. 66* at ¶ 42.

Corporal Ott also has no personal knowledge or evidence that Sergeant Goodwin, Trooper Savannah, Trooper Fausey, or Clerk Stimaker played the recordings outside of PSP. *Doc. 50* at ¶ 44; *doc. 66* at ¶ 44. Corporal Ott, however, has played the recordings for himself and others outside the Coudersport Barracks.[10] *Doc. 50* at ¶ 45; *doc. 66* at ¶ 45.

**J. The Aftermath.**

In citing to the complaint, the Defendants acknowledge Corporal Ott's allegations that, as a result of them accessing and listening to the recorded telephone conversations that he had with Mrs. Ott, false allegations were spread about him throughout the Coudersport Barracks, as well as throughout the other surrounding barracks.[11] *Doc. 52* at 10. The Defendants also acknowledge that this ultimately led Corporal Ott to filing a complaint with Internal Affairs, thereby triggering an investigation. *Id.* The Defendants finally acknowledge that Corporal Ott was never determined to be the sender of the anonymous letter. *Id.* at 11.

**IV. Summary Judgment Standard.**

The Defendants have moved for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall

---

[10] The evidence to which the Defendants have pointed does not clarify how Corporal Ott obtained a copy of these recordings.

[11] The precise nature and extent of these false allegations, however, is unclear to the Court.

grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011) (quoting FED. R. CIV. P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing

that the materials cited do not establish the absence . . . of a genuine dispute." FED. R. CIV. P. 56(c). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322. Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248-49. When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'"

*N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex*, 477 U.S. at 323). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the

pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

## V. Discussion.

### A. Corporal Ott's Federal Claim.

In Count II of the complaint, Corporal Ott asserts a "Violation of Federal Wire Tap [sic]" based on allegations that he and his wife's telephone conversations were intentionally "intercepted" and "disclosed" by the Defendants without his or his wife's consent, a warrant, or other justifiable excuse. *Doc. 1* at 13-14. Although Corporal Ott has not cited to a specific federal statute that would prohibit such interception or disclosure, we presume, as the Defendants have, that he is referring to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510-2520. *See generally Bartnicki v. Vopper*, 532 U.S. 514, 522-24 (2001) (discussing the history behind the enactment of Title III, as well as its subsequent amendments).[12]

Where, as here, "we are called upon to interpret a statute, we must always begin with its plain language." *DIRECTV, Inc. v. Pepe*, 431 F.3d 162, 167 (3d Cir. 2005) (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)); *see also Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985) ("It is axiomatic that '[t]he starting point in every case involving construction of a statute is the language

---

[12]  Hereinafter referred to as the "Federal Wiretap Act" or the "Act."

19

itself.'" (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756 (Powell, J., concurring)).   And where that "'language is unambiguous and the statutory scheme is coherent and consistent, we cannot look further.'"   *DIRECTV, Inc.*, 431 F.3d at 167 (quoting *Robinson*, 519 U.S. at 340); *see also Caminetti v. United States*, 242 U.S. 470, 485 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the lawmaking body which passed it, the sole function of the courts is to enforce it according to its terms.").

With these guiding principles in mind, we now turn to the Federal Wiretap Act.[13]   In its present form, the Act provides, in material part, as follows:

(1) Except as otherwise specifically provided in this chapter any person who—

(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

(b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when—

---

[13] Although the Federal Wiretap Act has been characterized as a "comprehensive scheme" for the regulation of wiretapping and electronic surveillance (*Gelbard v. United States*, 408 U.S. 41, 46 (1972)), it has also been "famously resistant to interpretation" (Bruce E. Boyden, *Can A Computer Intercept Your Email?*, 34 CARDOZO L. REV. 669, 674 (2012) (collecting cases that discuss, among other things, the complexity, obscurity, and convolutedness of the Act)).

(i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication;

\* \* \* \*

(c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

(d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; or

(e) (i) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, intercepted by means authorized by sections 2511(2)(a)(ii), 2511(2)(b)-(c), 2511(2)(e), 2516, and 2518 of this chapter, (ii) knowing or having reason to know that the information was obtained through the interception of such a communication in connection with a criminal investigation, (iii) having obtained or received the information in connection with a criminal investigation, and (iv) with intent to improperly obstruct, impede, or interfere with a duly authorized criminal investigation,

shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

18 U.S.C. § 2511(1). In subsection (4), a person who engages in such conduct shall be fined, or imprisoned—but not more than five years, or both. *See* 18 U.S.C. § 2511(4). And in subsection (5), a person who engages in such conduct shall be

subject to a suit by the federal government in a court of competent jurisdiction. *See* 18 U.S.C. § 2511(5).

In addition to the Act delineating the type of conduct that is prohibited and thus punishable, the Act also provides that "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520(a). Appropriate relief includes: "(1) preliminary and other equitable or declaratory relief as may be appropriate; (2) damages under subsection (c) and punitive damages in appropriate cases; (3) and a reasonable attorney's fee and other litigation costs reasonably incurred." 18 U.S.C. § 2520(b).

Thus, these pertinent sections of the Federal Wiretap Act can be succinctly summarized as follows: § 2511(1) prohibits and thus punishes certain unauthorized conduct, while § 2520(a) permits a civil action to be brought against those persons who have engaged in such unauthorized conduct. With all of this in mind, we now turn to the parties' instant dispute.

### 1. Interception.

In Count II of the complaint, Corporal Ott alleges that his telephone conversations with his wife were "intercepted" by the Defendants and then "subsequently re-intercepted" when Clerk Stimaker made a copy of the recordings

from the Eventide Machine. *Doc. 1* at ¶ 63. The Defendants, on the other hand, argue that there was no "interception" of a wire, oral, or electronic communication. *Doc. 52* at 15-21. The Defendants further argue that without such an "interception," there can be no violation under the Federal Wiretap Act. *Id.* at 15.

The Act defines an "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device[.]" 18 U.S.C. § 2510(4). The Act then limits "intercept" by defining an "electronic, mechanical, or other device" as follows:

> [A]ny device or apparatus which can be used to intercept a wire, oral, or electronic communication other than—
>
>> (a) any telephone or telegraph instrument, equipment or facility, or any component thereof . . . being used by . . . an investigative or law enforcement officer in the ordinary course of his duties[.]

18 U.S.C. § 2510(5)(a)(ii) (emphasis added). An "[i]nvestigative or law enforcement officer" includes "any officer . . . of a State or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this [Act] . . . ." 18 U.S.C. § 2510(7).

As explained by the United States Court of Appeals for the Sixth Circuit, "Congress most likely carved out [such] an exception for law enforcement officials to make clear that the routine and almost universal recording of phone lines by

police departments and prisons, as well as other law enforcement institutions, is exempt from [the Act]." *Adams v. City of Battle Creek*, 250 F.3d 980, 984 (6th Cir. 2001) (citation omitted). Indeed, this type of routine and universal recording of all phone activity in and out of a police department is a practice that "is well known in the industry and in the general public[.]" *Id.*

In this case, the undisputed material facts establish: that the Coudersport Barracks maintains a communications desk for the purpose of, among other things, fielding calls from the public (*doc. 50* at ¶ 25; *doc. 66* at ¶ 25); that there are two handheld telephones at the communications desk, and the calls coming through those telephones are automatically recorded (*see doc. 50* at ¶ 26; *doc. 66* at ¶ 26); that the recordings from those telephones are saved on the Eventide Machine, which is also located at the communications desk (*doc. 50* at ¶ 28; *doc. 66* at ¶ 28); that the log-in information, to access the recordings on the Eventide, was displayed on the outside of that machine (*doc. 50* at ¶ 29; *doc. 66* at ¶ 29); and that when Corporal Ott engaged in the disputed telephone conversations, he was not only on duty, but he was working the communications desk (*doc. 50* at ¶ 31; *doc. 66* at ¶ 31).

Based on these undisputed material facts, we find that the device at the Coudersport Barracks, which was used to record Corporal Ott's telephone conversations on March 16, 2012, was a device that was being used in the ordinary

course of those Barracks.  As such, we find that this device is covered by the law enforcement exception that is contained in the Federal Wiretap Act.  *See First v. Stark Cty. Bd. of Commissioners*, No. 99-3547, 2000 WL 1478389, *3-4  (6th Cir. 2000) (unpublished opinion) (finding no violation of the Federal Wiretap Act because the law enforcement exception contained in § 2510(5) applied to a telephone recording system at a sheriff's department, where that system was being used in the ordinary course of the department's duties when it indiscriminately recorded all telephone conversations, including the plaintiff's personal conversation); *Amati v. City of Woodstock*, 176 F.3d 952, 954 (7th Cir. 1999) (finding that the recorded telephone conversations of unknowing employees and former employees, as well as their family members and friends, fell within the law enforcement exception contained in § 2510(5) of the Act, since "[i]t is routine, standard, hence 'ordinary' for all calls to and from the police to be recorded [as those] calls may constitute vital evidence or leads to evidence, and monitoring them is also necessary for evaluating the speed and adequacy of the response of the police to tips, complaints, and calls for emergency assistance.").  And, because we find that this device is covered by the law enforcement exception that is contained in the Federal Wiretap Act, we further find that it does not qualify as an "electronic, mechanical, or other device."  *United States v. Hammond*, 148 F. Supp. 2d 589, 592 (D. Md. 2001), *aff'd*, 286 F.3d 189 (4th Cir. 2002) (explaining

that if the recordings are covered by the law enforcement exception contained in the Federal Wiretap Act, then they were not made by an "electronic, mechanical, or other device" and do not, therefore, fall within the meaning of the term "intercept" as that term is defined in the Act). And thus, it follows, because Corporal Ott has not established that the recordings were made by an "electronic, mechanical, or other device," he has not met all of the requisite elements of an "intercept." Corporal Ott, therefore, has not shown that there was an "interception" under the facts of this case.

Even if, however, Corporal Ott could show that there was an "interception," we would still find that the Defendants are entitled to summary judgment. As set forth above, an "intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device[.]" 18 U.S.C. § 2510(4). Although the Act defines most of the terms used in this definition,[14] it does not define an "aural" or "other" acquisition. *See* 18 U.S.C. § 2510.

_____

[14]A "wire communication" is defined as "any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station) furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce[.]" 18 U.S.C. § 2510(1). Courts have understood that telephone conversations constitute wire communications. *See, e.g.*, *Briggs v. American Air Filter Co., Inc.*, 630 F.2d 414, 417 (5th Cir. 1980) (explaining in the

As commonly understood, however, an "aural" acquisition is to acquire through the sense of hearing. *See, e.g.*, *Application of U. S. for Order Authorizing Installation & Use of Pen Register*, 546 F.2d 243, 245 (8th Cir. 1976) ("An 'aural acquisition' by definition engages the sense of hearing." (citation omitted)); *United States v. Seidlitz*, 589 F.2d 152, 157 n.17 (4th Cir. 1978) ("The words 'aural acquisition' literally translated mean to come into possession through the sense of hearing." (citation omitted)); *United States v. Torres*, 751 F.2d 875, 893 (7th Cir. 1984) (construing the definition as being "limited to devices which acquire information through the sense of hearing." (collecting cases)); *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992) (recognizing that "aural" is defined as "of or pertaining to the ear or the sense of hearing" (citation omitted)); *Steve Jackson Games, Inc. v. United States Secret Service*, 36 F.3d 457, 461 (5th Cir. 1994) (defining "aural" as "of or relating to the ear" or "of or relating to the sense of hearing" (citation omitted)).

Thus, it presupposes that an "other" acquisition is to acquire without the sense of hearing. *See generally Rodriguez*, 968 F.2d at 136 (explaining that Congress inserted this phrase, "other acquisition," to "ensure privacy protection for new forms of communication such as electronic pagers, electronic mail, and

context of the Act that "[a] telephone conversation is a wire communication." (citations omitted)); *United States v. Ross*, 713 F.2d 389, 391 n.4 (8th Cir. 1983) ("A telephone conversation is a 'wire communication' within the meaning of the [Act]." (citation omitted)).

computer-to-computer communications." (citing, *inter alia*, S.Rep. No. 99–541, 99th Cong., 2d Sess., *reprinted in* 1986 U.S. Code Cong. & Admin. News 3555, 3555–57, 3562–65, 3567)); *Steve Jackson Games, Inc.*, 36 F.3d at 461 (explaining that certain communications cannot be acquired aurally and that the phrase "other acquisition" makes it "illegal to intercept the nonvoice portion of a wire communication.  For example, it is illegal to intercept the data or digitized portion of a voice communication." (citing S.Rep. No. 99–541, 99th Cong., 2d Sess. 13 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3567)).

Regardless of the type of acquisition, however, there is a temporal component to acquiring the contents of a wire, electronic, or oral communication. *See Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 113 (3d Cir. 2003), as amended (Jan. 20, 2004) (stating that an interception "must occur contemporaneously with transmission."); *see also* Thomas R. Greenberg, *E-Mail and Voice Mail: Employee Privacy and Federal Wiretap Statute*, 44 AM. U.L. REV. 219, 248 (1994) ("Based on the common definition of 'intercept,' meaning to '*interrupt the progress or course of*, the acquisition of a wire, oral, or electronic communication will constitute an 'interception,' only while being transmitted in a manner prescribed by § 2511(1)(b)(i)-(iii)." (emphasis added) (footnotes omitted)).

Thus, when we apply these guiding principles here, and when we assume that the recording device at the Coudersport Barracks constitutes an "electronic,

mechanical, or other device," we can easily conclude that Corporal Ott's telephone conversations (i.e., wire communications) were contemporaneously intercepted because they were recorded while they were in transmission. *See generally Byrd v. Aaron's, Inc.*, No. 11-101, 2012 WL 12887775, at *7 (W.D. Pa. Feb. 17, 2012) (employing a sports analogy that a communication can only be intercepted when it is "in flight," and thus once a pass receiver on the offensive team has caught the football, the opportunity for an interception has closed (citation omitted)).

But, even when we reach this conclusion, that there was a contemporaneous interception, we still find that Corporal Ott has failed to present any evidence that the Defendants in this action are the ones who actually intercepted his telephone conversations on March 16, 2012. In other words, Corporal Ott has not adduced, or at least pointed to, any evidence in the summary judgment record that these particular Defendants were the ones responsible for installing, controlling, running, or otherwise maintaining the recording system at the Coudersport Barracks such that they could be held liable or responsible for contemporaneously intercepting Corporal Ott's conversations. *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) ("Although the non-moving party receives the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the non[-]moving party must point to some evidence in the record that creates a genuine issue of material fact." (citation omitted)); *In re IKON Office*

*Solutions, Inc.*, 277 F.3d 658, 666 (3d Cir. 2002) ("[A] party will not be able to withstand a motion for summary judgment merely by making allegations; rather, the party opposing the motion must go beyond its pleading and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing there is a genuine issue for trial." (citation omitted)); *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) ("Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." (quoted case and internal quotation marks omitted)).

In fact, the summary judgment record before us suggests the contrary—that the Defendants did not have any involvement or participation with the Coudersport Barracks' Eventide Machine until March 30, 2012, which was two weeks after Corporal Ott's telephone conversations had already been recorded. Corporal Ott's seeming argument, however that a new and different acquisition of information occurred each time the recordings were subsequently replayed is unpersuasive. Indeed, while the United States Court of Appeals for the Third Circuit does not appear to have addressed this issue, "a number of other circuits . . . have held that a replaying of tapes containing recorded phone conversations does not amount to a[n] . . . interception in violation of the [Federal] Wiretap Act." *Noel v. Hall*, 568

F.3d 743, 749 (9th Cir. 2009); *see also Reynolds v. Spears*, 93 F.3d 428, 432-33 (8th Cir. 1996) (finding no interception where the contents of the telephone conversations were revealed through the replaying of previous recordings); *United States v. Shields*, 675 F.2d 1152, 1156 (11th Cir. 1982) (finding that an interception occurred when the agents heard the conversation being transmitted by a radio and when the tape recording of that conversation was made, but not when persons listened to the tape); *United States v. Turk*, 526 F.2d 654, 658 (5th Cir. 1976) ("The argument that a new and different . . . acquisition occurs each time a recording of an oral communication is replayed is unpersuasive. That would mean that innumerable 'interceptions,' and thus violations of the Act, could follow from a single recording." (footnote and some internal quotation marks omitted)).  It is our view that such a holding is consistent with the contemporaneous component of an interception—that the acquisition of the communication must occur *while* the communication is being transmitted.

In sum, we find that the device used to record Corporal Ott's telephone conversations falls within the scope of the law enforcement exception such that it does not constitute an "electronic, mechanical, or other device" under the Federal Wiretap Act. We further find that even if this device could constitute an "electronic, mechanical, or other device," we would still conclude that the Defendants are entitled to summary judgment because Corporal Ott has

wholeheartedly failed to present evidence that the Defendants are the ones who actually intercepted the disputed telephone conversations. We will, therefore, enter summary judgment in favor of the Defendants with respect to Corporal Ott's claim that the Defendants intercepted those conversations in violation of the Act.

## 2. Disclosure.

In Count II of the complaint, Corporal Ott also alleges that after he and his wife's telephone conversations were "intercepted," they were then disclosed to "others." *Doc. 1* at ¶ 63. These allegations, however, are sparse, and the precise context of the alleged disclosure is unclear to the Court.[15] Having reviewed the summary judgment record, however, it appears that Corporal Ott is raising an argument that the automatically recorded telephone conversations, which were stored on the Eventide Machine, were played, copied onto a DVR, and then subsequently re-played for (i.e., disclosed to) Sergeant Goodwin. *See, e.g.*, *doc. 65-4* at 42-43 (dep. 42:18-43:14) (containing Trooper Savannah's deposition, wherein he testifies to this fact).

As set forth above, the Federal Wiretap Act attaches liability to a person who "intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral,

---

[15] His briefing fares no better.

or electronic communication in violation of this subsection[.]" 18 U.S.C. § 2511(1)(c).[16] Thus, in order for a person to be held liable under § 2511(1)(c), it must be established that there was an unlawful interception and that the defendant knew or had reason to know that the information obtained from that unlawful interception was in violation of the Federal Wiretap Act. *See generally Nix v. O'Malley*, 160 F.3d 343, 348 (6th Cir. 1998) (discussing in the context of the Federal Wiretap Act and the equivalent Ohio wiretap law, that this disclosure provision "establishes two preconditions to a finding of liability: the interception must have violated the law, and the defendant must have known or had reason to know this when he disclosed the contents of the intercepted communication.").

In this case, however, Corporal Ott (as discussed above) has failed to establish that there was an unlawful interception of his telephone conversations. And, even assuming that he could establish such an interception, he has still failed to present any evidence that the Defendants either knew or had reason to know that the disclosure of the information from those telephone conversations was prohibited in light of the Act. Corporal Ott's failure to present such evidence is underscored by the record which illustrates that the Coudersport Barracks routinely and indiscriminately recorded the calls that came through the phones at the

---

[16] We presume that Corporal Ott is referring to 18 U.S.C. § 2511(1)(c) and not 18 U.S.C. § 2511(1)(e)—the other disclosure provision in the Federal Wiretap Act— since § 2511(1)(e) does not appear to be applicable to the facts of this case.

communications desk.  The record further illustrates that these calls, which were saved on the Eventide Machine, have been accessed by PSP personnel in the past in order to, among other things, confirm information conveyed by a caller.  Thus, this record does not suggest that these Defendants knew or would have had reason to know that the disclosure of the information from Corporal Ott's telephone conversations was in violation of the Act.

Accordingly, because Corporal Ott has not adduced any competent evidence that there was an unlawful interception or that the Defendants knew or would have had reason to know that the disclosure of the contents obtained from such an interception was in violation of the Federal Wiretap Act, we conclude that the Defendants are entitled to summary judgment with respect to the alleged "disclosure" of Corporal Ott's recorded telephone conversations.[17]

---

[17] Because we reach this finding, we need not address the Defendants' additional argument that they are entitled to summary judgment on the basis of qualified immunity. *See doc. 52* at 26-34. We are, nevertheless, of the view that the Defendants' qualified immunity argument has been appropriately raised since it does not appear to have been "beyond debate" that the law enforcement exception would not apply to their challenged conduct. *See, e.g.*, *Diana v. Oliphant*, 441 F. App'x 76, 81 (3d Cir. 2011) (non-precedential) (finding that the PSP officers were entitled to summary judgment on the basis of qualified immunity because it was not clearly established that the law enforcement exception contained in the Federal Wiretap Act would not apply to them in recording an administrative phone call to another  PSP officer); *Walden v. City of Providence, R.I.*, 596 F.3d 38, 54 (1st Cir. 2010) (finding that the defendants were entitled to judgment as a matter of law on the basis of qualified immunity, and explaining that a line of cases addressing the Federal Wiretap Act would have led a reasonable government official to conclude

## B. Corporal Ott's State-Law Claims.

Having found that the Defendants are entitled to summary judgment on Corporal Ott's federal claim, the only claims that remain are his state-law claims over which this Court has supplemental jurisdiction. As explained above, those state-law claims are set out in Count I, alleging a violation of Pennsylvania's wiretap law, and Count V, alleging a claim for intentional infliction of emotional distress. The Defendants contend that the Court should decline exercising its supplemental jurisdiction over these claims. *See doc. 52* at 38-39. We agree.

The issue of whether to exercise supplemental jurisdiction is a matter within the court's discretion. Indeed, 28 U.S.C. § 1367(c)(3) provides that district courts may decline to exercise supplemental jurisdiction over a state-law claim if the district court has dismissed all claims over which it has original jurisdiction. And, in exercising its discretion, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)); *see also Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) ("'[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless

that recording all calls into a police station was neither illegal nor unconstitutional).

considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'" (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (emphasis in original))).

Here, there is nothing unique about this case such that considerations of judicial economy, convenience, and fairness provide an affirmative justification for exercising supplemental jurisdiction after disposing of Corporal Ott's only surviving federal claim. Accordingly, we will use our discretion to not exercise supplemental jurisdiction over the two remaining state-law claims in this action. If he so chooses, Corporal Ott is free to file his Pennsylvania wiretap law claim and his intentional infliction of emotional distress claim in state court.

## VI. Conclusion.

Based on the foregoing discussion, the Defendants' motion for summary judgment will be granted, and judgment will be entered in their favor on the Federal Wiretap Act claim, which is set out in Count II of the complaint. In addition, Count I, alleging a violation under Pennsylvania's wiretap law, and Count V, alleging a claim for intentional infliction of emotional distress, will be dismissed, but without prejudice to Corporal Ott seeking relief in state court.

An implementing order follows.

*S/Susan E. Schwab*
Susan E. Schwab
United States Chief Magistrate Judge